IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No.1:20-cr-00341-ELH |
| vs. | : | |
| | : | |
| GARY EDWARD DAVIS | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM IN AID OF SENTENCING**

COMES NOW the Defendant, Gary Edward Davis, by and through James N. Papirmeister, Esquire, of the Law Offices of James N. Papirmeister, P.C. and, hereby submits the following Memorandum with attachments to aid this Court in rendering the sentencing decision in this case, scheduled July 14, 2021 at 2:30 pm:

<u>GARY DAVIS' SENTENCING ARGUMENT IN A NUTSHELL</u>

We are going to ask for a sentence that applies a substantial downward guidelines variance in this case. Given the nature and circumstances of the offense, the history and characteristics of Gary Davis, his disadvantaged background, his truly commendable character and efforts to rehabilitate himself and study the root cause of his offense, and the tremendous upheaval and pain in his and his wife's life that this case has wrought, we submit warrants a  result that is

1

more in line with what a state court in Maryland would typically do in a case like this case, which in fact started out in the District and Circuit Courts of Frederick County. We hope to demonstrate that this case is extraordinary, that Gary Davis is extraordinary, and that our recommendation is entirely appropriate and in line with the sentencing factors delineated in 18 USC §3553(a).

<u>CHILDHOOD</u>

Gary grew up in Frederick County, Maryland as the sister of Cheryl Mathis-Lynn, nee Davis, and as one of two children of Mr. George Davis and Mrs. Anna Davis. His father was a farmer and his mother assisted on the farm and was a homemaker. She currently lives in Ormond Beach, Florida. His father passed away in 2005, from Non-Hodgkins Lymphoma, when Gary was about 32 years old.

A Psychosexual Risk Assessment and Evaluation was commenced in this case by Dr. Ronald I. Weiner, Ph.D., a long-time clinical member of the Association for the Treatment of Sexual Abusers [ATSA], shortly after Gary's release on bond in the Frederick County case, which was the precursor to this federal case. Dr. Weiner was employed by this counsel almost from the inception of this counsel's retention as Gary's attorney by Gary's family. Dr. Weiner

2

engaged in in-depth interviews with Gary about his background and his involvement mostly before this counsel did, and the bulk of what this counsel has learned about Gary's background, came from Dr. Weiner's extensive and months-long evaluation process rather than this counsel's client interviews. Dr. Weiner is one of the premier ATSA Clinical Members and experts in the field of Psychosexual Risk Assessments and Evaluations in the Maryland and DC Metropolitan Area. He has served as a court expert for several federal and state judges, and has been a frequent contractor with the United States Probation Office to conduct evaluations and treatment in such cases. [**See Exhibit 11, CV of Dr. Weiner**]. References to Dr. Weiner's evaluation will hereafter be made as "Weiner, p. <u>x</u>", and the evaluation is contained in its entirety as **Exhibit 1**.

It can be accurately said that Gary grew up in a household and family that provided for his basic childhood needs and with parents that were well-intentioned in terms of exposing Gary to positive values, including hard work, education, religious training, and exposure to farming. He attended Catholic schools in Frederick through middle school, and went to Frederick High School, graduating in June, 1990. He was bullied, rejected by peers, and teased as a freshman

3

and sophomore, but became more popular in his Junior and Senior years. He reports being embarrassed by his weight, physique, and lack of athleticism, which improved as he became involved in the football team in high school. He was an average student, but was never held back a grade, never suspended and never missed school or skipped classes.

All was not well in his childhood, however. Gary grew up on a pig farm in Adamstown, Maryland. He reports that most of his growing up years were lonely and sad, and he frequently felt ignored by his parents. He had few friends and worked on the farm doing chores, often played outside alone, and watched television when allowed by his parents. He described his father as very stern, belittling, demanding, disconnected, busy and unloving. His father was a relentless taskmaster and was prone to angry outbursts and physical punishment of Gary, who continuously felt his father's disappointment in him. Gary feared his father, who criticized him about his weight, and other matters, and Gary lived in terror of being beaten. While his mother was grounded, consistent, and often the peacemaker, she too was distant.

Gary has established in adulthood a better relationship with his mother, who traveled up from her home in Florida to offer support when Gary was arrested. Gary enjoys a strong

4

relationship with his sister, Cheryl Mathis-Lynn, who suffered the death of her first husband, and he also has a strong relationship with her second husband Mike. Sheryl and Mike and their 10-year-old daughter also live in Frederick.

Worse than his father's abusive treatment, moreover, was another seminal childhood occurrence in Gary's life. Gary's family's devotion to rearing him in the Catholic faith, and their regular involvement in, and attendance at their local parish, unfortunately, put Gary in a position and place to suffer childhood sexual abuse and trauma.

> Mr. Davis reported that he was the victim of child sexual abuse on multiple occasions perpetrated upon him by an elder at his parish. He was an altar boy at the time these events occurred. He advised that the elder watched him disrobe exposing his genitals and buttocks and "slid his hands into my privates and smelling and watching." He indicated that the elder groomed him into allowing the elder to fondle him veiled with perceived legitimacy that he had to be clean and not smell before being allowed to perform his altar boy activities. He reported feeling "confused" and "small." He never disclosed this information to his parents or to anyone else. He reports that he continues to feel traumatized by the experience he encountered as a pubescent age boy.

Weiner., pp 10-11. Gary describes having painful memories of this abuse, and while he suppressed it for much of his life, he has undergone extensive therapy for about 15 months, and

it has been coming out now and the details are very clear to Gary.

The pernicious effects of exposure to repeated childhood sexual abuse, the incidence of delayed reporting, and myriad manifestations of life-long adult traumatic effects are well-documented. Gary Davis' offense conduct is one such, not atypical manifestation.

<u>SERVICE TO COUNTRY</u>

Gary Davis served 23 years in the United States Navy. He enlisted and entered active duty on August 1, 1990, shortly after graduating high school. He was Honorably Discharged on September 30, 2013, retiring as a Senior Chief Petty Officer (E-8). He served in numerous on-shore duty posts in Europe and the United States, as well as on numerous naval war vessels at sea and on nuclear submarines. He was trained in cryptology and electronic intelligence, combat systems, and ballistic missile defense. He achieved the second highest ranking for an enlisted service member and earned numerous Navy and Marine Corps Commendation Medals. He was selected for the Military Electronic Intelligence Signals Analysis Program [MESAP], as one of only eight service members selected annually from all the armed services, to participate in the NSA's MESAP program.

He was in charge of 600 people in his command. He was on track to obtaining the highest rank he could achieve as Master Chief Petty Officer (E-9) or eligibility to serve as a Command Master Chief, either of which would have required him to extend his enlistment for an additional four years and be deployed at many sea-duty posts. His marriage was at this time, falling apart, however, and he painfully decided to turn down these career paths to salvage his marriage. Upon taking this step, he was then shifted to administrative duties, which essentially meant he was relegated to an office and paperwork-heavy assignments, which he found unrewarding and unsatisfying. [**See Exhibit 3 for documentation of Gary's military service**].

While serving on active duty, Gary diligently pursued distance education and completed online undergraduate and graduate degree-earning programs. He earned an Associate of Science Degree in March, 2007 from Excelsior College. He then completed his Bachelor of Science there in 2008. He then earned a Master of Business Administration in 2009 from the University of Phoenix. [See **Exhibit 4**].

Subsequent to Gary turning down his military advancement and being relegated to the strictly administrative duties, and in an effort to salvage his marriage and family life,

Gary retired from the military. He was Honorably Discharged in September, 2013, [see **Exhibit 3**], but he was fearful of his transition to the private sector.

<u>PRIVATE SECTOR WORK</u>

Gary at first was hired in the last part of 2013 to 2014 as a Program Manager for SRC, a national security company. Gary was then hired as a Business Process Expert and Program Manager [USCYBERCOM] at CACI, a Defense Department [DOD] contractor, providing defense, intelligence, homeland security, and healthcare solutions, from March 2014 through December, 2014.

Gary was then hired in December, 2014 at TechGuard Security Company, another DOD contractor, starting out as a Prime Contract Manager. He served in that capacity for about four years until September, 2018, which included his serving as Regional Director. During that time, he advanced to become Vice President of Government Programs from 2016 to March, 2020, when his arrest in this case in Frederick County occurred, and he lost his Top Secret/Specially Compartmented Information//Special Access Program clearance.

Mr. Davis' position with TechGuard Security is sometimes misunderstood. He was never a Cyber Security Technician. He

8

provided contract and personnel management, business development and talent recruitment management. "Gary's role at TechGuard was not a technical Cyber Security Technician. "Gary held a Program Management Professional Certification (PMP) and he oversaw a large portfolio of contracts that TechGuard held with the Government. "Gary's role was to make sure that every project was staffed appropriately, deliverables were met and that the contract ran within budget". [**Letter from Carla Stone, President and CEO of TechGuard, Exhibit 5**].

Gary was highly valued and was very successful in his job at TechGuard. None of his behaviors in the receipt or possession of any pornography was done at this job. All his work computers were inspected and none was found to contain any pornography at all, let alone child pornography. Gary's CEO as well as all the other principals and employees at TechGuard were shocked and certainly dismayed about Gary's charges and arrest in this case. They have suffered a great loss without Gary serving as a Vice President of the Company. When he was terminated in March, 2020 as a result of his arrest in this case, he was making over $200,000 a year, on top of receiving his monthly military pension and disability payments. He and his wife and children were not rich, and

9

were laden with substantial debt even then, but he could adequately provide for his wife Alysa and his younger daughter Allison. Now, the family is financially bankrupt, and we use the term "financially" with care. As you will see below, and from an attachment, even with the discharge of some of his debts in bankruptcy, and through the TPD program for disabled vets who owe parental student loans, his monthly retirement and disability check is barely enough to live on. With the prospect of his possible incarceration for longer than 60 days, he will lose, as will his wife, 90% of his monthly disability payment. This will put his wife and him in an ever growing and dire financial hole every month.

<u>GARY DAVIS' FAMILY</u>

While deployed in the Navy, Gary met his wife Alysa in Rota, Spain and the couple married on October 31, 1997. They have one child Allison who is now 22 and a second child Lisa who is now 28 and lives with her fiancé and two children in Alaska. Allison was diagnosed with thyroid cancer and underwent surgery at age 16 to treat the cancer. She graduated Towson State University and is working temporarily in a restaurant in Baltimore. [For reasons previously explained, more details on the children are set forth on page 10 of Dr. Weiner's report].

Prior to his meeting her, Alysa was unfortunately the victim to long-term intrafamily sexual abuse as a child, and equally troubling, a gang rape by American servicemen when she was 21 years old. She has significant mental health issues, including prominent Post-Traumatic Stress Disorder [PTSD], significant Persistent Postural Perceptive Dizziness [PPPD], sexual problems, and numerous physical disabilities. She suffers from vertigo, digestive problems, and other health issues and is completely disabled. She can no longer drive a vehicle. [**See Alysa's letter under Exhibit 6 and some of her medical reports in Exhibit 7**].

Gary and Alysa truly love each other and their relationship has been improving since Gary has embarked on his therapy over the last 15 months. The couple's marriage suffered greatly over the years, however, through Gary's military deployments and other career obligations, and through Alysa's deteriorating physical and mental health. Due to both Gary's own history of sexual problems and his wife's traumatization, physical and mental health issues, the couple's level of intimacy dwindled to virtually nothing over the years, despite both maintaining a strong devotion and loyalty to one another, and very positive physical appearances.

11

As is mentioned in the Character Statements, [**Exhibit 8**], Alysa has been deteriorating mentally and physically for years, is now 100% disabled and is entirely dependent on Gary for emotional, physical, and financial support. Twenty-two [22] year old daughter Allison Davis poignantly describes the depth of her mother's dire situation, and is racked with guilt about not wanting to stop her career and life to move back home and take care of her mother, if her father is incarcerated, noting her mother's considerable needs. *Id.*

Gary's 51 year old sister, Sheryl Mathis-Lynn acknowledges some of the difficulties Gary confronted in his childhood, particularly with his father. She and Gary have always been close and have obviously been there for each other throughout their lives. *Id.* Gary's mother Anna Davis is not as forthcoming or aware of her late husband's contribution to Gary's condition, nor of Gary's victimization in the parish, because he has not wanted to discuss these things with her. It was suggested in the PSI that Gary's mother can help his wife Alysa out if Gary is incarcerated. Gary's mother can come up from her home in Florida for short periods of time, in the event of an emergency such as Gary's sudden arrest. But she is 78 years old and lives on a fixed income in Ormond Beach, Florida. She is not prepared to, nor

can afford to, just move to Maryland in her financial condition, with her residence in Florida and the fact that she moved to Florida for the climate and lower cost of living.

The Court should also examine the letters provided by Gary's older daughter Lisa, and his brother-in-law Mike Lynn [**Exhibit 8**].

<u>FINANCIAL CONDITION</u>

In **Exhibit 9**, you will see a Discharge in Bankruptcy, a revised Asset and Liability balance sheet prepared by Gary, and the TPD discharge of the student parental loans Gary was paying off, from his daughter's college education.

We ask the Court to seriously consider that once Gary may be imprisoned more than 60 days, his military retirement of $2,578 a month will not change, but his VA disability benefit of $3,667 a month will drastically change. [He is determined as 100% disabled.] The benefit will be reduced by 90% down to $147 a month. While his wife Alysa, can apply to receive additional benefits, it is highly unlikely she will be able to recoup the lost 90%. Furthermore, it often takes up to 18 months to be approved for whatever she may be able to obtain.

As Gary's bankruptcy has now been finalized and the

13

balance sheet looks somewhat more manageable for the time being, it is still barely enough to live on now, and provides for a monthly positive cash flow of about $77.00. Once he loses 90% of the disability benefit, it will constitute a desperate situation for Alysa, and present her with a probable foreclosure of her and Gary's home, not to mention limiting her to a bare minimum on which to live.


## THE OFFENSE

Gary Davis has plead guilty to count two, knowing possession of child pornography, which images had been received and possessed via his Apple iPad Mini, from December 27, 2019 to January 21, 2020. While the number of total videos exceeded 500, it appears less than 30 contained short clips of approximately 30 seconds each depicting prepubescent minors. The time period of the offending behavior contained in the Indictment was from December 27, 2019 to January 21, 2020, or just over three weeks. The images were recreated forensically by the FBI and had not been saved on hardware recovered in this case. In fact, it is significant, that prior to his knowledge he was being investigated and being charged, Gary rather emphatically, engaged in physically destroying his iPad Mini, which was the singular device he

used to send, receive, and consume this contraband material.

Gary explained to Dr. Weiner how his involvement came about:

> Once he entered into private chat rooms on the internet via KIK he found himself in a setting occupied by persons who were preoccupied with sexualizing children and sharing and trading images and videos of children engaged in either sexualized scenes or in direct sexual contact with adults. He stated:
>
> *"I became involved in these chat rooms that were deviant and lost my moral compass for immediate gratification. I looked at [images and videos] of underage adolescent females that were inappropriate along with viewing a general pattern of looking at adult pornography. I saw stuff that was very young. I was primarily looking at twelve to sixteen-year old females doing dances and thought that nobody was forcing them. At the time, in my mind no harm was done; nobody forced her to do that."*
>
> Mr. Davis stated, "When you're in a private group of twenty people, your logic gets skewed." He stated that he wanted to terminate his involvement with these groups of individuals who were sending child pornography and did so by destroying everything that he had on his mini I-Pad. He reported feeling that he had seen everything and "couldn't believe the level of depravity that was out there. He started praying that he would be able to rid himself of viewing any and all forms of pornography but "knew that it had a grip on me and I wanted it gone, out of my life and knew that I was not in a good place. He stated that he destroyed his mini I-Pad in early February, 2020 prior to his arrest stating that he needed to "get this out of my life." He indicated that he could never imagine voicing the words of how deviant, disgusting, and evil the child sexual exploitation material sent to him and that he sent out to others was. He felt deep shame about posting material just to have access to these private rooms with others interested in child pornography stating that these sites required that one must post material in order to receive material from others. Failure to do so would prevent one from being allowed to continue participation in the chat room.
>
> Mr. Davis stated that he destroyed his I-Pad in the basement of his home and put it in a trash bag and threw it away in a dumpster behind his work. He stated that once he made the decision to get

15

rid of this, "I felt like I'd made a good decision and the burden was lifted, I had made some progress and felt like I had beat it. I knew it was wrong and wanted desperately to purge it out of my life."

Weiner, pp 5-6.

Dr. Weiner summarizes Gary's behavior thus:

Mr. Davis is a first-time offender with no history of sexual offenses, violent criminality, or any property related crimes. He has no chronic or sustained history of substance abuse or alcohol abuse or dependence to complicate potential for compliance with any, and all, probation supervision and mandated sex offender treatment requirements the Court may impose. His test results do not indicate that he has any serious mental disorder that would complicate compliance with community supervision and sex offender treatment (e.g., schizophrenia, delusional disorder, bi-polar disorder). He does, however, have some rather serious emotional management issues and personality issues that will need to be addressed during the course of any treatment he may receive.

There is no evidence from a review of law enforcement reports to indicate that Mr. Davis communicated with any child for purposes of engaging in sexual activity.

Mr. Davis is married. His wife is supportive of him and was unaware that Mr. Davis was involved in child pornography activities. He has one biological child with his wife, as well as an adopted daughter.

Mr. Davis' test scores do not indicate evidence of him having antisocial personality features. He does not have a history of antisocial acts and involvement in illegal activities aside from his index offense. He does not have a generally exploitative approach to interpersonal relationships. His test scores indicate that he does not have any problems with aggression (aggressive attitude, verbal aggression, or physical aggression). **Mr. Davis' index offense and his sexual and life history do not indicate that he is a preferential predatory pedophile.** The functional analysis of his offense conduct indicates that his behavior involving the index offense represents a crime committed as a result of a combination of expressive motivations (negative emotional states) described earlier in the report.

Based on an assessment of his scoring on the C-PORT, along with a

16

dynamic risk assessment SOTIPS identifying the targets of needed change, the results of his sexual history questionnaires, and my own clinical interviews and rating of his overall level of emotional adjustment and stability with Mr. Davis, Mr. Davis is assessed currently as being in the **low risk category for sexual re-offense involving child pornography.** His predicted probability of sexual re-offense involving child pornography is 2.8% for five years.

Mr. Davis' test results and my own assessment interviews indicate that he is a very good candidate for involvement in sex offender treatment and is likely to benefit such that he can develop information, knowledge, and skills for avoiding sexual recidivism. There is every indication that Mr. Davis can be safely treated in the community without any undue risk to public.

Weiner, pp. 22-23, some emphasis supplied. Many people wonder how one who possesses child pornography could not be deemed a pedophile. Dr. Weiner explains:

Although, on the surface, Mr. Davis offense conduct involving possession and distribution of child pornography could reasonably be assumed to represent pedophilic disorder, I do not consider this to be an accurate representation that characterizes his offense conduct. He does not present historically showing sexual interest in children. He did not engage in online sexual communications with a minor or an undercover officer posing as a minor. He did not have any child pornography text stories. He did not volunteer in a role with high access to children. His behavior leading to his arrest and charges appears to be part and parcel of a larger problem with pornography use generally combined with his involvement in high-risk transient and homosexual contact with men with whom he met on the internet. His high-risk involvement in private online groups with men interested in child pornography is indicative of his having impulse control difficulties related to general pornography use as well as with his sexual impulses. His prolonged marital problems have left him bereft of any sexual intimacy with his wife leaving him to cast about in unhealthy high-risk sexual transient sexual behaviors with other men.

Weiner, p. 19.

Dr. Weiner made comprehensive treatment recommendations

after he completed his evaluation, which took many months. All the while he was being evaluated, from the very week of his pretrial release in the Frederick County case, Gary was simultaneously undergoing weekly individual counseling with the Executive Director of Clinical and Forensic Associates, an ATSA Clinical Sex Offense Treatment program. As of November, 2020, Gary added weekly 90 minute group sessions on top of the weekly 45-minute individual sessions. All told, he has now spent 65 weeks as of June 30, 2021 in weekly individual sessions, and 51 hours of group sessions in the 34 weeks from November, 2020 through June, and counting.

## COMPLIANCE WITH RELEASE CONDITIONS AND TREATMENT PROGRESS

Gary was initially held without bond in the Frederick County Detention Center, after an initial bail hearing, on his arrest for the related state charges on March 13, 2020. Pursuant to a motion, he was granted a second bail review hearing on March 27, 2020. He was released pursuant to several restrictive, special conditions, supervised by the Frederick County Probation Department. Those conditions included 24-hour-a-day home confinement with electronic monitoring, mandatory psychosexual risk assessment by Dr. Weiner, weekly sex offense counseling by Clinical & Forensic

Associates, an ATSA Clinical Program, mandated installation on all electronic devices in the home of Covenant Eyes Anti-pornography software, to be monitored by Dr. Weiner, an ATSA Clinical member, with any violations thereof reported to the probation agent, no contact with minors, and alcohol and drug screening. Mr. Davis was fully compliant with all these conditions, and left his home a total of four (4) times in eight (8) months, as of November 4, 2020, [the commencement of this federal case and concomitant *nolle prosequi* of his state case]. Those four departures from his home were for preapproved medical appointments and an attorney office visit. **[See attached Bail Review Summary, Order for Special Conditions of Release and Order for Pre-Trial Home Detention, Exhibit 10**].

Moreover, similar release conditions were imposed on Mr. Davis in this federal case as of November, 2020, and Mr. Davis has been compliant with both the Covenant Eyes monitoring software, and the federal antipornography software, without any violations being reported for either his Frederick County, or federal pretrial supervising authorities. He has been fully compliant with his processing by the US Marshalls, and his provision of extensive documentation to his pretrial agent as well as Ms.

19

McGuinness, the PSI Investigation Specialist.

Moreover, Elizabeth Raeder Freeland, as an ATSA clinical sex offense counseling specialist, who is the Executive Director of Clinical and Forensic Associates, indicates that Mr. Davis has made substantial and excellent progress over the 15 months of his near flawless participation in the treatment program. [**Exhibit 2**, with refences to this report hereafter being made as "Raeder, p. <u>x</u>"].

Director Raeder-Freeland writes:

> His individual sessions with me continue to be meaningful and productive. He attends all scheduled sessions on time and prepared, and has completed additional psychoeducational work I have assigned to him. He continues to demonstrate a strong understanding of relapse prevention techniques that we have discussed, and reports that he remains motivated to complete treatment successfully. His participation in group treatment is also excellent. He has emerged as a leader, providing empathic support to members of his group who are struggling emotionally, but also willing to challenge individuals who are engaging in high- risk actions or utilizing cognitive distortions to justify lapse and relapse sexual behaviors.

Raeder, p. 1. Ms. Raeder-Freeland notes that one particularly valuable exercise known as a "clarification letter" has been successfully undertaken by Gary, and his letter is attached as **Exhibit 2B.** This strategy involves having Mr. Davis take full accountability for his actions by writing to the victims he injured by his use of child pornography. "Mr. Davis took

the assignment seriously and produced a thoughtful and comprehensive letter, indicating that he now possesses an understanding of the severe damage sexual abuse inflicts on child and adolescent victims, which I believe he has deeply internalized." Raeder, p. 2.

.   Ms. Raeder-Freeland is very positive about Gary's treatment progress:

> He continues to display a commitment to working towards understanding his behaviors, in the service of preventing recidivism and living a more fulfilling life. In addition, he continues to demonstrate what I perceive as a genuine sense of remorse and shame for his behaviors. These are positive treatment indicators, as acceptance of responsibility is a crucial piece of relapse prevention treatment.

Raeder, p. 2.

Ms. Raeder agrees with Dr. Weiner that Gary is not a pedophile, despite the material that was extracted by the FBI in its forensic analysis. She notes that the root causes of his offending behavior are from:

> various unmet needs that contributed to his offense behaviors, including: toxic stress resulting from working long hours and having too many job responsibilities; stress related to reintegration and acclimation to civilian life after 20 plus years of service in the United States Navy; isolation; intimacy deficits in his marriage resulting from mental and physical health issues experienced by his spouse, and his inability to communicate effectively with her; lack of a support network; and unresolved sexual trauma, and resulting adjustment and mood issues.

21

Raeder, p. 3. She indicates that:

> my provisional assessment does not lead me to
> believe that he meets the diagnostic criteria of
> a pedophile- someone who experiences intense and
> recurrent sexual urges towards and fantasies
> about prepubescent children. He is now able to
> recognize that his offense behaviors were
> maladaptive coping techniques that he used to help
> him manage negative emotional states and
> emotional adjustment difficulties, particularly
> related to stress and isolation.

Id. Ms. Raeder-Freeland diagnoses Gary as having "Compulsive
Sexual Behavior Disorder" [Raeder, p. 4], who presents as a
"fantasy driven offender" as opposed to a "contact driven"
offender [Raeder, p. 5].

She points out that his relationship with his wife Alysa
has improved considerably in the last 15 months, as he has
made efforts towards being emotionally honest with her, and
is committed towards working on problems in the marriage,
particularly, emotional intimacy deficits. *Id*. She notes he
has shown greater control over his urges, and an ability to
avoid risky situations that could provoke his acting out.
Raeder, pp. 5-6. "In addition, he has followed all clinical
recommendations made by this writer, including obtaining a
psychiatric assessment and following the clinical

recommendations of his psychiatrist." Raeder, p. 6.

Ms. Raeder agrees with Dr. Weiner's pretreatment assessment that Gary is low risk for recidivism [Raeder, p.6, p. 7], which is especially a strong factor now that he has undergone 15 months of treatment.

> Mr. Davis's continued excellent participation and progress in treatment, along with the various mitigating factors mentioned above, continue to indicate a **positive treatment prognosis**. This suggests that he is a strong candidate for an extended period of probation in the community in lieu of a long period of incarceration, should the court see fit to sentence him in such a way. As noted in my previous letter, Dr. Ronald Weiner correctly stated in the psychosexual risk evaluation he completed on Mr. Davis that research indicates that individuals who commit sexual offenses respond more favorably to treatment and supervision, thus lowering their risk of recidivism, when they are monitored in the community. It is my clinical opinion that Mr. Davis represents a **low -risk** to sexually reoffend, and will continue to make additional gains in our treatment program.

Raeder, pp. 6-7, emphasis in original. As demonstrated in this exemplary Treatment Progress Report, Gary Davis has embraced his wrongful conduct, he has embraced the intense search to discover its root causes,  and has embraced every condition of release and treatment recommendation made to him by top professionals in the field, uncompromisingly.

<u>THE LOSSES AND THE PUNISHMENT IN THIS CASE</u>

The losses Gary has experienced from his arrest and charges in this case are profound. He has lost his job, his top secret security clearance, his career, and any reasonable

job prospects. He spent several weeks in the Frederick County Detention Center, before being released on 24-hour-a-day, home electronic monitoring, where the few times he has left his home, have been solely for preapproved medical visits for his wife, and legal and court obligations. That is a loss of freedom.

Upon Frederick County District Court Judge Dino Flores' decision to release Gary on a bond reconsideration motion, Gary was the subject of very negative coverage in a local newspaper article, and was excoriated in very negative comments made to the newspaper by people in his own neighborhood.   He has lost any semblance of community respect. He feels utterly embarrassed by his offense, shamed and humiliated. He feels like a pariah and scourge of the community. He has lost his dignity in so far as the community is concerned.

He will be a lifetime convicted felon and on the sex offender registry pursuant to SORNA and Maryland Law as a Tier I offender for 15 years. In Doe v. Dep't of Pub.Safety & Corr. Servs, 430 Md 535 (2013), the Court of Appeals of Maryland (J. Greene) expounded on the requirements of someone being on the registry.

[a person] must report in person to law

24

enforcement every three months, give notice to
law enforcement of his address and any changes
of address, and notify law enforcement before
being away from his home for more than seven
days…. Furthermore, he must disclose to the
State a significant amount of information, some
of which is highly personal, including: his
employment address; information about his
conviction; his social security number; his
email address and computer log-in names;
information about vehicles he often uses,
including those not owned by him; his finger
prints and palm prints; all 'identifying
factors, including a physical description,' and
an updated digital image of himself….
Additionally, other than to vote, [the person]
is prohibited from entering onto real property
that is used as a school or a family child care
center licensed under [the Family Law Article]
without first obtaining permission…. If [the
person] fails to comply with these requirements,
he faces terms of imprisonment depending on the
violation, of up the three or five years….

430 Md. at 562.

Quoting from prior Maryland cases and the Supreme Court,
the Court of Appeals opinion goes on to highlight the grossly
deleterious effects of registration in markedly powerful terms.

[D]issemination of a registrant's information,
including some private information, imposes
'affirmative disabilities' on registrants
because the dissemination has the effect of
'labeling a registrant as a sexual offender
within the community which can be highly
stigmatizing and can carry the potential for
social ostracism….' Internet notification[that
was beginning to be used in Maryland would]
threaten widespread disclosure of highly
personal data and may implicate social
ostracism, loss of employment opportunities, and

25

> possibly verbal and physical harassment…. The
> result is that the dissemination of information
> about registrants… is the equivalent of shaming
> them, and is, therefore, punitive for ex post
> facto purposes….
> **Justice Ginsburg noted in her dissent in <u>Smith</u>,
> the 'public notification [requirement], which
> permits placement of the registant's face on a
> webpage under the label 'Registered Sex
> Offender', calls to mind shaming punishments
> once used to mark an offender as someone to be
> shunned'.**

<u>Id</u>. at 565-566, emphasis supplied, and some citations and some text omitted.

Gary lost his income, and his financial solvency, and both he and his wife are financially tenuous and on the brink of true financial desperation, especially if he is incarcerated longer than 60 days. Now and even more significantly after any period of incarceration, this now 49 year old man, has very limited employment prospects. He has had three invasive foot surgeries and is 100% physically disabled and cannot serve as a laborer.

As the Court well knows, the opening line of 18 USC §3553(a) mandates that the Court impose a sentence "sufficient but not greater than necessary" to achieve the enumerated purposes of sentencing. The applicable guidelines in this case, simply overrepresent the extent and nature of Gary Davis' conduct. Were this case to have remained in the

Frederick County Circuit Court, there is little doubt in this writers' mind that Gary would be granted a fully suspended sentence, with full credit for the now 16 months he spent in jail or on court-ordered home monitoring, and he would be placed on five years supervised probation, with typical conditions, including no unsupervised contact with minors, an order to successfully complete treatment at Clinical and Forensic Associates, an order to submit to all sexual history, maintenance and exit polygraphs as directed by his treatment provider, an order to register as a Tier 1 sex offender for 15 years, and an order to take all prescribed medications, to comply with psychiatric treatment, and all the standard conditions of probation.

Frankly, I do not know what any period of incarceration would hope to accomplish in this case other than the interest of making this first offender's month-long foray into the seedy world of Child Porn, consistent with the Guidelines range of 51 to 63 months. Gary Davis has demonstrably gotten the message from his offense, has wholeheartedly embraced his treatment and rehabilitation with every fiber of his being. He has been severely punished with life-long devasting consequences to his job, career, finances, reputation, stability of his family, particularly as to his wife, and has

27

a   somewhat   bleak   future.   He   is   crushed,   demoralized, humiliated,   shamed,   embarrassed,   shunned   and   brought   very low.

### A SUBSTANTIAL VARIANCE DOWNWARD IS WARRANTED

Gary   pled   guilty   to   the   possession   of   child pornography.   Without   minimizing   the   nature   of   his   conduct, it   was   limited   to   what   he   did   in   a   three-week   period   via   his iPad   Mini   device.   He   had   no   in-person   contact   with   any minors.

The   Base   Offense   Level   in   this   matter   is   18   (27-33 months).   The   various   specific   offense   characteristics   in this   case   have   the   effect   of   essentially   "supercharging" guidelines   calculations   resulting   in   a   final   Total   Offense Level   of   24.   This   is   after   a   three   level   reduction   for acceptance   of   responsibility,   with   a   resulting   guidelines range   of   51-63   months,   or   about   five   years   for   man   with   no prior   criminal   record   and   an   otherwise   impeccable   personal history.

While   the   calculations   of   the   Guidelines   are   technically correct,   they   do   not   represent   a   reasonable   assessment   of Gary's   level   of   culpability   in   this   matter.

The   use   of   a   computer   is   a   "given"   in   just   about   every child   pornography   case   and   certainly   in   nearly   every   case

where there is these days, a distribution, a possession and/or a receipt count. Additionally, the Specific Offense Characteristic for over 600 images will be applied in nearly every child pornography case, particularly where there are videos involved as five videos become the equivalent of more than 600 images for Guidelines purposes.

It is hard to imagine a child pornography case where there would ever be a strictly "Base Offense Level" case.

The need to be extraordinarily careful in the application the 2G2.2 Guidelines has been the subject of comment and caution by a number of courts as well as by the Sentencing Commission.

In *United States v. Dorvee*, 616 F.3d 174, 182-83 (2d Cir. 2010), the Second Circuit first reminded that even where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the § 3553(a) sentencing factors and that under § 3553(a)'s "parsimony clause," it is the sentencing court's duty to "impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth" at 18 U.S.C. § 3553(a)(2). [I apologize for the length of the following quoted passage, and

acknowledge it pertains to a defendant whose offense conduct is more serious than Gary's conduct. Nevertheless, the opinion notes several compelling considerations about the guidelines and child pornography cases that are relevant to the sentencing analysis in our case].

Even where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the § 3553(a) sentencing factors. *See Cavera*, 550 F.3d at 189. Under § 3553(a)'s "parsimony clause," it is the sentencing court's duty to "impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth" at 18 U.S.C. § 3553(a)(2). *United States v. Samas*, 561 F.3d 108, 110 (2d Cir. 2009). In applying § 3553(a) and its parsimony clause, the court must look to "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), and the Guidelines themselves, 18 U.S.C. § 3553(a)(5). In conducting this review, a district court needs to be mindful of the fact that it is "emphatically clear" that the "Guidelines are guidelines-- that is, they are truly advisory." *Cavera*, 550 F.3d at 189.

As we have explained, Dorvee's sentence was a within-Guidelines sentence. However, we do not presume that such sentences are reasonable when we review them substantively. *See United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006) (declining to establish "any presumption, rebuttable or otherwise, that a Guidelines sentence is reasonable"). In United *States v. Rigas*, 583 F.3d 108 (2d Cir. 2009), we elaborated on the definition of substantive reasonableness. We likened our substantive review to the consideration of a motion for a new criminal jury trial, which should be granted only when the jury's verdict was "manifestly unjust," and to the determination of intentional torts by state actors, which should be found only if the alleged tort "shocks the conscience." *Rigas*, 583 F.3d at 122-23. We concluded that substantive reasonableness review is intended to "provide a backstop" against sentences that are "shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *Id*. at 123. We also emphasized that substantive reasonableness review is not an opportunity for "tinkering" with sentences we disagree with, and that we place "great trust" in sentencing courts. *Id*.

Though we recognize the importance of punishment and deference, we nevertheless find Dorvee's sentence substantively unreasonable. First, we are troubled by the district court's apparent assumption that Dorvee was likely to actually sexually assault a child, a view unsupported by the record evidence yet one that plainly motivated the court's perceived need "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). We believe that this assumption, in the face of expert record evidence to the contrary, caused the

district court to place unreasonable weight on this sentencing factor. *See Cavera*, 550 F.3d at 191 "At the substantive stage of reasonableness review, an appellate court may consider whether a factor relied on by a sentencing court can bear the weight assigned to it."). Although presented with medical evidence that Dorvee was unlikely to engage in a personal relationship "unless the other person took the lead" -- as the undercover agent posing as "Seth" had -- the district court's comments at sentencing reveal that the court was convinced that Dorvee was a "pedophile" likely to engage in sexual conduct with a minor. The court stated that although it believed Dorvee would not initiate a relationship with a child, "if he were given the opportunity, he would have sexual relations . . . with a younger boy." App. 136. The district court stated that "[f]or an adult of Justin's age to engage in sexual conduct with somebody under the age of 14 . . . I think is extremely hurtful. . . . [I]t might be worse than sticking somebody with a knife or shooting them with a gun." *Id*. Dorvee, however, is not alleged to have had any actual contact with children (undercover or real) under 14, and admitted only to taking non-explicit photographs of children's feet. Dorvee appears to have been punished as though he already had, or would, sexually assault a child, despite medical testimony to the contrary and Dorvee's lack of any such criminal history. The irony of the court's conclusion in this area, as we explain below, is that the Guidelines actually punish some forms of direct sexual contact with minors *more leniently* than possession or distribution of child pornography.

Similarly, the district court's cursory explanation of its deterrence rationale ignored the parsimony clause. "Plainly, if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not . . . impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). Here, the district court provided no reason why the maximum sentence of incarceration was required to deter Dorvee and offenders with similar history and characteristics. Moreover, the district court offered no clear reason why the maximum available sentence, as opposed to some lower sentence, was required to deter an offender like Dorvee.

Finally, we are also troubled that the district court seems to have considered it a foregone conclusion that the statutory maximum sentence "probably [would] be upheld" on appeal, apparently because it concluded that its sentence was "relatively far below" the initial Guidelines calculation of 262 to 327 months. App. 145. In all events, even a statutory maximum sentence must be analyzed using the § 3553(a) factors. As the Supreme Court made clear in *Gall*, the amount by which a sentence deviates from the applicable Guidelines range is not the measure of how "reasonable" a sentence is. Reasonableness is determined instead by the district court's individualized application of the statutory sentencing factors. *See Gall*, 552 U.S. at 46-47.

These errors were compounded by the fact that the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires. Sentencing Guidelines are typically developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. *See Rita*, 551 U.S. at 349. However, the Commission did not use this empirical approach in formulating the Guidelines for child pornography. Instead, at the direction of Congress, the Sentencing Commission has amended the

31

Guidelines under § 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties. *See* United States Sentencing Commission, *The History of the Child Pornography Guidelines*, Oct. 2009, *available at* http://www.ussc.gov/general/20091030_History_Child_Pornography_Guidelines. pdf (last visited April 19, 2010). Alan Vinegrad,  the former United States Attorney for the Eastern District of New York, has noted that the recent changes effected by the PROTECT Act of 2003 evince a "blatant" disregard for the Commission and are "the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress," as Congress:

(i) adopted sentencing reforms without consulting the Commission, (ii) ignored the statutorily-prescribed process for creating guideline amendments, (iii) amended the Guidelines directly through legislation, (iv) required that sentencing data be furnished directly to Congress rather than to the Commission, (v) directed the Commission to reduce the frequency of downward departures regardless of the Commission's view of the necessity of such a measure, and (vi) prohibited the Commission from promulgating any new downward departure guidelines for the next two years.

Alan Vinegrad, *The New Federal Sentencing Law*, 15 Fed. Sent. R. 310, 315 (June 2003).

The PROTECT Act of 2003 was the first instance since the inception of the Guidelines where Congress directly amended the *Guidelines Manual. See* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, 2004, at 72, available at http://www.ussc.gov/15_year/chap2.pdf (last visited April 15, 2010).
The Commission has often openly opposed these Congressionally directed changes. In 1991, as Congress was considering a proposal to direct the  Commission to alter the child pornography Guidelines (by revoking the Commission's earlier creation of a new, lower base level for receipt, possession, and transportation of images than for sale or possession with intent to sell), the Chair of the Commission wrote to the House of Representatives stating that the proposed Congressional action "would negate the Commission's carefully structured efforts to treat similar conduct similarly and to provide proportionality among different grades of seriousness," and would instead "require the Commission to rewrite the guidelines for these offenses in a manner that will reintroduce sentencing disparity among similar defendants." *See* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines*, January 1, 2009, at 4-9, available at http://www.fd.org/pdf_lib/child%20porn%20july%20revision.pdf (unpublished Comment, last visited July 28, 2010). Congress did not follow the Chair's advice. In 1996, the Commission criticized the two-level computer enhancement (which is currently set forth at § 2G2.2(b)(6) and was adopted pursuant to statutory direction) on the ground that it fails to distinguish serious commercial distributors of online pornography from more run-of-the-mill users. *See* United States Sentencing Commission, *Report to Congress: Sex Offenses Against Children Findings and Recommendations Regarding Federal Penalties*, June 1996, at 25-30, available at http://www.ussc.gov/r_congress/SCAC.PDF (last visited April 15, 2010). Speaking

broadly, the Commission has also noted that "specific directives to the Commission to amend the guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress." *See* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform, supra*, at 73.

The § 2G2.2 sentencing enhancements cobbled together through this process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases. The base offense level for distribution of child pornography, which in 1991 was 13, has been gradually increased to 22 as the Commission has attempted to square the Guidelines with Congress's various directives. See United States Sentencing Commission, *The History of the Child Pornography Guidelines, supra*, at 19. On top of that, many of the § 2G2.2 enhancements apply in nearly all cases. Of all sentences under § 2G2.2 in 2009, 94.8% involved an image of a prepubescent minor (qualifying for a two-level increase pursuant to § 2G2.2(b)(2)), 97.2% involved a computer (qualifying for a two-level increase pursuant to § 2G2.2(b)(6)), 73.4% involved an image depicting sadistic or masochistic conduct or other forms of violence (qualifying for a four-level enhancement pursuant to § 2G2.2(b)(4)), and 63.1% involved 600 or more images (qualifying for a five-level enhancement pursuant to § 2G2.2(b)(7)(D)).

*See* United States Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics for Fiscal Year 2009*, available at http://www.ussc.gov/gl_freq/09_glinexgline.pdf (last visited April 19, 2010).

In sum, these enhancements, which apply to the vast majority of defendants sentenced under § 2G2.2, add up to levels, resulting in a typical total offense level of 35.

An ordinary first-time offender is therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction. Consequently, adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories. This result is fundamentally incompatible with § 3553(a). By concentrating all offenders at or near the statutory maximum, § 2G2.2 eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and violates the principle, reinforced in *Gall*, that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct. *See Gall*, 552 U.S. at 55 (affirming a sentence where "it is perfectly clear that the District Judge considered the need to avoid unwarranted disparities, but also considered the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated" (emphasis in original)).

The irrationality in § 2G2.2 is easily illustrated by two examples. Had Dorvee actually engaged in sexual conduct with a minor, his applicable Guidelines range could have been considerably lower. An adult who intentionally seeks out and

contacts a twelve year-old on the internet, convinces the child to meet and to cross state lines for the meeting, and then engages in repeated sex with the child, would qualify for a total offense level of 34, resulting in a Guidelines range of 151 to 188 months in prison for an offender with a criminal history category of I. Dorvee, who never had any contact with an actual minor, was sentenced by the district court to 233 months of incarceration. What is highly ironic is that the district court justified its 233-month sentence based on its fear that Dorvee *would* sexually assault a child in the future.

A defendant convicted under 18 U.S.C. § 2252A(a)(5) of possessing on his computer two nonviolent videos of seventeen-year-olds engaging in consensual sexual conduct qualifies for a base offense level of 18 under § 2G2.2(a)(1), a two-level enhancement for use of a computer under § 2G2.2(b)(6), and a three-level enhancement for number of images under § 2G2.2(b)(7)(B). Even with no criminal history, this individual's total offense level of 23 would result in a Guidelines sentence of 46 to 57 months. This is the same Guidelines sentence as that for an individual with prior criminal convictions placing him in a criminal history category of II, who has been convicted of an aggravated assault with a firearm that resulted in bodily injury.

The Sentencing Commission is, of course, an agency like any other. Because the Commission's Guidelines lack the force of law, as the Supreme Court held in *United States v. Booker*, 543 U.S. 220, 245, 264, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), sentencing courts are no longer bound to apply the Guidelines. But, in light of the Sentencing Commission's relative expertise, sentencing courts "must consult those Guidelines and take them into account when sentencing." *Id*. This deference to the Guidelines is not absolute or even controlling; rather, like our review of many agency determinations, "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co*., 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944); *see Kimbrough*, 552 U.S. at 109 (citing the crack cocaine Guidelines as an example of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role"). On a case-by-case basis, courts are to consider the "specialized experience and broader investigations and information available to the agency" as it compares to their own technical or other expertise at sentencing and, on that basis, determine the weight owed to the Commission's Guidelines. *United States v. Mead Corp*., 533 U.S. 218, 234, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001) (internal quotation marks omitted) (citing *Skidmore*, 323 U.S. at 139); *see Gall*, 552 U.S. at 51.

In keeping with these principles, in *Kimbrough*, the Supreme Court held that it was not an abuse of discretion for a district court to conclude that the Guidelines' treatment of crack cocaine convictions typically yields a sentence "greater than necessary" to achieve the goals of § 3553(a), because those particular Guidelines "do not exemplify the Commission's exercise of its characteristic institutional role." *Kimbrough*, 552 U.S. at 109-10. As we have explained here, the same is true for the child pornography enhancements found at § 2G2.2. Following *Kimbrough*, we held that "a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to

a wide class of offenders or offenses." *Cavera*, 550 F.3d at 191. That analysis applies with full force to § 2G2.2.

> **District judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2 -- ones that can range from non-custodial sentences to the statutory maximum -- bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results. While we recognize that enforcing federal prohibitions on child pornography is of the utmost importance, it would be manifestly unjust to let Dorvee's sentence stand. We conclude that Dorvee's sentence was substantively unreasonable and, accordingly, must be revisited by the district court on remand**.

United States v. Dorvee, 616 F.3d 174, 182-88 (2d Cir. 2010), emphasis supplied.

Applying these principles and considerations, the compelling facts of this case and Gary Davis' ordinarily, exemplary character traits, and law-abiding nature, his work ethic, service to our country, family devotion, sincere remorse, his efforts at confronting his troubling past traumas which were certainly not his fault, his dutiful following of every pretrial release and treatment recommendation, and the need for him to take care and provide for his ailing wife, all conspire to suggest a reasonable sentence is not to put this man in jail. From the time of his arrest on March 13, 2020 until his sentencing date of July 14, 2021, amounts to 16 months. While this Court is not required to give Gary any credit for his two plus weeks in the Frederick County Detention Center, nor to his

remaining time on court-ordered, 24-hour home electronic confinement, it should give him credit, as would a State court be mandated to do. His compliance with all the very restrictive pretrial release conditions in both the state and federal court, was flawless. Sixteen months is about the equivalent of 13-14 Offense Levels in the Sentencing Table.

By this point in our analysis, there should be no dispute that Gary Davis has already been justly punished. He has overwhelmingly demonstrated how seriously he takes the offense. There cannot possibly be any reasonable argument that he poses a danger to the public, especially if he continues treatment at Clinical and Forensic Associates [CFA]. It is doubtful he can attain the quality and depth of effective sex offender treatment at any facility in the Bureau of Prisons, with a team of ATSA Clinical Members, such are as employed at CFA, which has all masters and Ph.D. level clinicians, uses weekly individual and group sessions, and regularly employs sexual history, maintenance and exit polygraphs, to ensure accuracy of information, and treatment compliance. The economic and emotional hardships that will befall Gary's wife, Alysa should he be incarcerated, will just add more misery and risk, and it is not necessary.

WITNESSES TO TESTIFY AT SENTENCING

We anticipate that in addition to Gary Davis addressing the Court, several of his family members may address the Court, such as his wife, sister, at least one of his daughters, and possibly, his treatment provider, Elizabeth Raeder-Freeland. We will notify the Court by July 6, 2021 as to whether Ms. Raeder-Freeland will be testifying, which family members will testify and the anticipated length of the proceedings.

CONCLUSION

For all the foregoing reasons, and as reinforced in the multiple exhibits and attachments to this Memorandum, and for additional reasons as may be set forth at the sentencing hearing, we respectfully request at least a 14 level downward variance, which would result in a total offense level of 10, and a resultant guideline range of 6-12 months, which we ask be served on electronic home monitoring.

Respectfully submitted and served via ECF this 1st day of July, 2021,

_James N Papirmeister_

James N Papirmeister, Esq.
Law Offices of James N Papirmeister,PC
8630 Fenton St., Suite 320
Silver Spring, Maryland 20910
Office(301)589-2100; Mobile(301)367-6500
Fax (240)444-8096; criminalfirm@yahoo.com
Bar # 10789