IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA          :
                                  :   Case No.1:20-cr-00341-ELH
        vs.                       :
                                  :
GARY EDWARD DAVIS                 :
                                  :
        Defendant.                :

**GARY DAVIS' REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

COMES NOW the Defendant, Gary Edward Davis, by and through James N. Papirmeister, Esquire, of the Law Offices of James N. Papirmeister, P.C. and, in response to the Government's Sentencing Memorandum, hereby submits the following Reply:

CLARIFYING CHARACTERIZATIONS OF MR. DAVIS' OFFENSE CONDUCT

Make no mistake, we are grateful the Government allowed Mr. Davis to resolve this case with a plea to possession. It was appropriate, as we shall here briefly discuss, but we are mindful the Government could have pursued a Distribution charge. We are also grateful the Government, appropriately so, made a below guidelines sentencing recommendation.

We must clarify, if not enlighten the Court, however, on several key points about Gary Davis' offense conduct.

1

The distribution aspect of Mr. Davis's offense conduct, was relatively *de minimis*, and was in the service of his being a possessor and consumer of the offending material. As set forth in Dr. Weiner's report and discussed in our original Sentencing Memorandum (p. 15), the private group chat rooms required all group members to participate by collectively sharing child pornography [CP] into the cloud space where the CP was stored. Mr. Davis did not ever save, download, or have a cache of CP that he personally kept or maintained at any time in the three-week offense period from December 27, 2019 to January 21, 2020. The material was kept in an electronic storage cloud maintained by KIK in which the chat group members had accounts, accessible to each member via their unique usernames and passwords.

The iPad Mini which Mr. Davis used to access the CP material was destroyed one month before any arrest, charge or knowledge of  an investigation was learned by Mr. Davis. None of his other laptops, desktops, cellphones and other home electronic devices, nor his work-related electronic devices that were recovered and/or inspected by the Government in this investigation, was used to access the material.

To access the material on the KIK platform, a user such as Mr. Davis was at that time, would have to have an account

2

with a user name and password, and would then go onto the
site, containing the stored and archived CP, accessible to
only members of the particular chat group. Once logged on,
each member of the group could access the images and videos
that were in this cloud of stored files. The member could
watch the videos and view any images with the click of a
mouse, or the member could choose to download and save the
material as he wished, into a hard-drive on his laptop, or
whatever electronic device the member wanted to use, for
later viewing or use of the material. Mr. Davis never
downloaded and saved any videos or images. The FBI did not
uncover a single video or image of CP on any device that was
owned by Mr. Davis and he also did not save anything on his
iPad Mini device.

Secondly, as was also previously set forth in Dr.
Weiner's report and discussed in our Sentencing Memorandum,
*Id.*, Mr. Davis was not allowed to access any material, unless
he contributed material that was CP. Where did he obtain the
material he contributed to the groups? From other groups in
KIK! In other words, in the three chat groups he participated
in, he obtained CP from one group, say "Young Share", and
without saving it, could and did simply forward it to another
group he participated in, say "Ups and Downs of Kids," in

3

order to meet the requirements for participating and viewing material posted in "Ups and Downs of Kids." Independently, he obtained no material, nor distributed any material, outside these three groups. He obtained the material from one chat group, and forwarded it to the next group, mostly made up of different members than the previous group, (though there could have been some overlap of members), in order to stay active and be allowed to access material in the second group.

Equally important to understand, moreover, is that the CP contained in these three chat groups, was uploaded into the chat group cloud and archived, continuously, over a 24-hour period. No member of the Chat groups, including Mr. Davis, would likely view all the material that was uploaded round the clock into the site, by all the members, collectively. It was uploaded by different group members, wherever around the country or around the world they happened to be, at all hours of the day and night. Neither Mr. Davis, and likely no one else in the groups, saw all the material, which was being uploaded, all the time, including while the person slept.  When any group member such as Mr. Davis, wanted to view a video or image, he would just log in to the chat group site, with his user name and password, and see links to the various materials and just click on a link and

immediately start to view any images or videos.

The reasons this is so significant in this case, is that Mr. Davis did not see, and physically could not view within the 21-day offense period, all the videos and images that were kept in these group-chat collections. He does not ever remember seeing anything with bestiality, or involving a two-year-old, or with violence perpetrated on a minor, for examples, as was described in the Government's memorandum [see GOV, p.1]. He saw much child pornography, but did not see all or even nearly all the videos and images the FBI indicated were collected in the chat groups, and cannot possibly know how many items he viewed.

To be clear, Mr. Davis did knowingly view CP, and knowingly saw videos that contained prepubescent minors. Mr. Davis certainly knew the material was contraband, was illegal, was immoral and was disgusting. So disgusted was he with himself and afflicted and conflicted with his addiction, that he destroyed the iPad Mini device he used to access the CP, the month before he got in trouble. He wanted to eradicate the demon inside him that caused not only his offense conduct, but was causing him mental turmoil and anguish, much as any drug addict would want to throw away his drugs and paraphernalia, in an effort to eradicate the

5

psychic pain and anguish of the addiction. Such efforts admittedly do not always work.

What we take issue with in the Government's memo [hereafter, referenced as "Gov, p. X"], is that Mr. Davis "collected and distributed a large number of images and videos depicting child exploitation," Gov, p. 3. Gary Davis collected nothing. He simply went on the site, chose and clicked a link, and viewed what was already collected on the site. He certainly did not distribute for profit.    He distributed a relatively small amount, actually shared it in the group collection, which is more apt to say, in order to obtain access to the total group cache. His so-called distribution was actually forwarding CP from the collection in one group to the collection in another. While there may have been a "vast library" of CP[Gov, p. 3], the library belonged to the group and not just Mr. Davis. It was not kept by him, managed by him, organized by him, or stored by him.

This counsel had occasion to meet with Special Agent Yesensky on December 16, 2020 to view some of the material collected in the investigation in this case. Of the 539 videos and 174 images ["approximately" 713 total items per the Government] recovered from the cache connected to the three groups on the KIK platform in this case, this counsel

was informed of, and shown 16 videos and 4 images that he was told contained depictions of prepubescent minors involved in sexual activity, that Mr. Davis "distributed" via his KIK account handle "Taboo Tendency". The rest of the items [713 minus 20 or 693 items] were recovered electronically from the group chat rooms in KIK. Of the 20 items involving prepubescent minors, that Mr. Davis distributed, most were 30-second or so, video clips, and did appear to involve prepubescent minors. While I do not claim to be an expert on the "Tanner Scale"[see ncbi.nlm.nih.gov], my observation of these very short video clips, led me to conclude that there were about four videos that appeared to depict minors in the age 5-10 range, and five videos that depicted minors in the age 7-12 range, with the remaining videos containing minors in at least the age 10 to 12 range, and quite frankly, several in the latter age range, appeared to be around 13 to 15 years old to this writer. I was provided with no identifications, nor expert age determinations, nor was I presented with any definitive evidence that all the minors in this group were "prepubescent", meaning under age 12. [USSG § 2G2.2(b)(2)]. I certainly did not see any videos or images containing bestiality, sexual involvement with a "toddler", or violence perpetrated on anyone.

I want to be clear. Mr. Davis acknowledges he viewed and "distributed" multiple videos that depicted sexually explicit conduct involving minors and particularly, prepubescent minors. The material depicting prepubescent minors was only a part of the material collected in the investigation, and we are comfortable enough with the word "significant" in terms of the amount, as used in the Statement of Facts. More precision as to the total number of images or videos involving prepubescent minors, or percentages thereof as to the total cache, and the exact images viewed, however, are just not possible.  We have not seen a catalog of all the files, and this counsel, unapologetically speaking, did not sit and view 539 videos and 174 images. Mr Davis certainly did not keep track of the numbers. **Most importantly, Mr. Davis did not view all 713 items from the cache the FBI collected from the chat groups in KIK.**

Remember, the items were continuously uploaded into the group collections, accumulated collectively and contributed to, by each member of the groups. There were three such chat groups, with about 20 members in each group, which included Mr. Davis, each of whom was required to contribute material, to be able view material.

These are additional reasons, therefore, why we believe

the reasoning in U.S. V Dorvee, discussed *supra*, 616 F.3d 174(2010)in our sentencing memo, is so relevant here. The §2G2.2 guidelines enhancements are just not, across the board, appropriate or fair, to apply to all cases, such as Mr. Davis' case. Collectively, the extent and number of enhancements, results in a guidelines total that over-represents the extent of Mr. Davis' offense conduct. Applying +2 points for material involving a prepubescent minor seems harsh, when only a part of the material, and an unknown percentage, involved prepubescent minors. We acknowledge it was a "significant" amount, only because there were multiple items that involved depictions of this "under age 12" group [USSG §2G2.2(b)(2)]. We cannot say beyond being "significant," as vague as that term is, that it was the lion's share or the majority of the material contained in the group collection, and we do not believe it was.

Then, applying +2 points for use of a computer, is absurd, because virtually all CP cases involve use of a computer. Applying +5 points, for involvement of more than 600 images, seems unduly harsh, since, "each video, video clip, movie, or similar visual depiction shall be considered to have 75 images," [USSG § 2G2.2, Commentary, §6(B)(ii)], and we really do not know how many videos Mr. Davis saw. It

9

is not even clear if Mr. Davis saw a majority of those 539 videos in just 21 days, and the fact of their having been uploaded into the group cache of material, literally while he slept.

If we were to subtract +2 points [prepubescent minor factor], +2 points [use of a computer factor], and +5 points[more than 600 images factor] from the calculations, we have a base level offense, with 3 points off for acceptance of responsibility. The total offense level would drop 9 points from 24 to 15. Without taking into consideration the aforementioned §3553(a) factors discussed in our Sentencing Memorandum, this level of 15 corresponds to a range of 18-24 months.

Those aforementioned §3553(a) factors are considerable----1-Mr. Davis' existing loss of his job and career; 2-his loss of job prospects going forward; 3-his loss of financial solvency; 4-his impending loss of disability payments; 5-his loss of esteem in the community; 6-his loss of freedom and imposition of travel limitations and other restrictions because of impending supervised release and sex offense registry requirements; and, 7-his impending loss of the ability to care for his ailing wife should he be further incarcerated. In addition to these painful losses, his

10

conduct is further mitigated by 8-his own childhood victimization to abuse; 9-his genuine remorse; 10-his tremendous and intense participation and success in his comprehensive evaluation and group and individual sex offense counseling for 15 months; 11-his exemplary compliance with pretrial supervision restrictions for 16 months; and 12-the relatively recent and short-lived duration of the offense. It is also mitigated by his being ordinarily, a model citizen and contributor to the service of the United States in the Navy for 23 years, and for another seven years in DOD contracting positions, a total of 30 years of exemplary service to the the United States.

## **WITNESSES & REMOTE SENTENCING**

After consideration of these two sentencing issues, we have decided that other than Mr. Davis and this counsel providing allocution, we are not intending on calling Mr. Davis' treating clinician, Elizabeth Raeder-Freeland, Executive Director of Clinical & Forensic Associates. We anticipate the possibility that one or two of the family members who provided a written statement of character in Exhibits 6 & 8, may wish to address the Court. Mr. Davis waives his right to have a live proceeding and elects to have a **REMOTE SENTENCING PROCEEDING**, but all family members wish

to be given video and audio access to the proceeding, as opposed to just the public audio line.

## CONCLUSION

We again recommend a downward guideline variance of 14 points to an offense level of 10, a resultant guideline range equivalency of 6-12 months, and service of time in that range, by Mr. Davis on electronic home detention. With his relatively short-lived offense period and his excellent response to supervision and treatment for over 15 months, a term of supervised release of five (5) years, and not longer, is warranted and appropriate. Voluntary Surrender for home detention or any period of incarceration is entirely appropriate in this case.

Respectfully submitted and served via ECF this 8th day of July, 2021,

*James N Papirmeister*

James N Papirmeister, Esq.
Law Offices of James N Papirmeister,PC
8630 Fenton St., Suite 320
Silver Spring, Maryland 20910
 Office(301)589-2100; Mobile(301)367-6500
Fax (240)444-8096; criminalfirm@yahoo.com
Bar # 10789